UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| | : |
| | : |
| -vs- | : CASE NO. 7:04-cr-20(HL) |
| | : |
| | : |
| TRELLINY T. TURNER, and | : |
| WILLIAM L. BROXTON, | : |
| | : |
| **Defendants.** | : |

### ORDER ON MOTION FOR NEW TRIAL

Defendant Trelliny Turner has filed a motion for new trial [Doc.83] following her conviction on April 5, 2005, on counts of Conspiracy to Steal United States Mail, Theft of United States Mail, Interstate Transportation of Stolen Property, Misleading Statements, and Money Laundering. Turner contends she is entitled to a new trial because of the admission of testimony regarding incriminating statements made by her co-defendant, William Broxton, in violation of her Sixth Amendment right to confrontation as set forth in Bruton v. United States, 391 U.S. 123 (1968). Upon consideration of the evidence presented at trial and the relevant legal authorities, the Court finds that no new trial is warranted in this case. The motion for new trial is accordingly **DENIED**.

This case arises from the burglary of the United States Post Office in Valdosta, Georgia, on September 4, 2004. The indictment alleges that Broxton and Turner conspired

1

and acted together to steal approximately $266,000 in cash from a locked "registry cage" at the Post Office. At the time of the burglary, Turner was an employee at the Post Office. The evidence showed that she had knowledge of the Post Office's practices and layout that was vital to the commission of the crime. She knew, for example that the Valdosta Post Office received large amounts of cash from surrounding Post Offices at a certain time each month. She knew that this cash was stored in the registry cage over the weekend, to be deposited at a local bank on Monday. She knew that during a two-hour period on the night of the burglary there would be only one employee on duty at the Post Office, an older man with poor eyesight. She knew that the Post Office could be entered through a door leading from a men's room accessible to the outside, and knew the combination to unlock that door. After the burglary, it is alleged that Turner assisted Broxton in concealing and laundering the stolen cash. Within days of the burglary, Broxton and Turner, who had very limited incomes, made several large cash purchases, spending approximately fifty thousand dollars on such items as cars and jewelry. In addition, ten thousand dollars in cash was recovered from a backpack found in the bedroom shared by Broxton and Turner. One bill in the backpack was marked with a red "USPS" stamp.

During the course of the trial, two witnesses for the government testified regarding statements made by Broxton that incriminated himself and his co-defendant Turner. Witness Robert Parrish, a cell-mate of Broxton's during pretrial detention in the Lowndes County Jail, testified that Broxton told him about the burglary of the Post Office in some detail.

According to Mr. Parrish, Broxton explained that his wife told him where the money was and laid out the plan for the burglary. Witness Lekisha Thorp, a girlfriend of Broxton's, testified that Broxton admitted to robbing the Post Office where his wife worked. She further testified that he claimed his wife had given him the information on how to go about the burglary and described her as the "organizer" of the burglary.

Neither Defendant raised any objection to either statement during the testimony of the witnesses. After the testimony of Ms. Thorp, the Court suggested to counsel for the Government that the testimony raised concerns under Bruton. The next day counsel for the Government brought the matter to the attention of counsel for the Defendants. Upon being informed of the potential Bruton issues, counsel for Defendant Turner moved the Court to sever the cases. Because the trial was already underway, the Court understood the motion to sever as calling for a mistrial on behalf of Defendant Turner. The Court took the matter under advisement and withheld ruling pending the close of evidence. Broxton did not testify at trial. At the close of evidence, Defendant Turner renewed her motion for severance or mistrial. The Court denied the motion and submitted the case to the jury with the following limiting instruction:

> When the Government offers testimony or evidence that a Defendant made a statement or admission to someone, after being arrested or detained, the jury should consider the evidence concerning such a statement with caution and great care.
>
> It is for you to decide (1) whether a Defendant made any statement and (2) if so, how much weight to give to it. In making these decisions you should

3

> consider all of the evidence about the statement, including the circumstances under which a Defendant may have made it.
>
> Of course, any such statement should not be considered in any way whatever as evidence with respect to any other Defendant on trial.
>
> Two witnesses, Robert Parrish and Lakeisha Thorpe, have testified regarding out of court statements by Defendant William Broxton. You are to consider this testimony only with regard to Defendant Broxton, and in determining the guilt or innocence of Defendant Turner you are not to consider any of the alleged statements of Defendant Broxton.

Court's Charge to the Jury, Doc. 77, p. 36. The jury returned a verdict finding Turner guilty of five of the six counts with which she was charged in the indictment. After trial, Turner filed a timely motion for new trial pursuant to Rule 33(b)(2) of the Federal Rules of Criminal Procedure, which provides a district court with discretion to vacate a judgment and grant a new trial "if the interest of justice so requires." The "interest of justice" is a broad standard and does not limit the grant of a new trial to cases where there is legal error that would merit reversal in the court of appeals. United States v. Vicaria, 12 F.3d 195, 198 (11th Cir. 1994).

There is no question that the statements of defendant Broxton to which Mr. Parrish and Ms. Thorp testified violated Turner's rights under Bruton. In Bruton, the Supreme Court held that a defendant's Sixth Amendment right to confront and cross-examine witnesses against her is violated by the admission of an extrajudicial statement by a non-testifying co-defendant that incriminates the defendant. The Court found that the admission of such testimony could not be cured by a limiting instruction because in the context of such damaging evidence, "the risk that the jury will not, or cannot, follow instructions is so great,

4

and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored." Bruton., 391 U.S. at 135.

Although the admission of the statements by the Government's witnesses was erroneous, the Court ruled at trial that the error was harmless in light of the substantial weight of the other evidence against Turner. Upon further reflection and review of the written arguments of counsel, there is no reason to alter that conclusion. It is well-settled in the Eleventh Circuit that Bruton violations are subject to harmless error review. See, e.g., United States v. Van Hemelryck, 945 F.2d 1493, 1503 (11th Cir. 1991). A new trial is not warranted in cases where "'the properly admitted evidence of guilt is so overwhelming, and the prejudicial effect of the codefendant's admission is so insignificant by comparison, that it is clear beyond a reasonable doubt that the improper use of the admission was harmless error.'" United States v. Petit, 841 F.2d 1546, 1556 (11th Cir. 1988) (quoting Schneble v. Florida, 405 U.S. 427, 430 (1972)).

The evidence introduced by the Government as to Turner's guilt was so overwhelming that the prejudicial effect of the statements attributed to defendant Broxton was indeed insignificant by comparison. Broxton's alleged statements merely state directly the conclusion that jurors must otherwise have drawn from the tightly-woven web of circumstantial evidence presented by the Government – the conclusion that Turner was the mastermind of the burglary who used her inside knowledge as a Post Office employee to guide her accomplices to the right place at the right time. Inside knowledge was essential

to the execution of the burglary, as the burglars clearly knew the best time to enter the Post Office, where to find the cash remittances, and how to enter both the building and the registry cage with minimal effort. As an employee of the Post Office, Turner would have known that large sums of money were received from nearby post offices and stored in the registry cage just after the first of the month. She would have known that between 8:00 and 10:30 in the evening of September 4 only one employee would be on duty at the Post Office, an employee who happened to be one of the older employees and who had very poor eyesight. She would have known that the building could be entered from the outside through the men's toilet and known the code for the door from the men's toilet to the interior of the office.

The evidence of Turner's behavior after the burglary further supports the conclusion that she was a knowing participant in the scheme. Within days of the burglary, she and Broxton suddenly had access to large amounts of cash, even though he only had a reported income of $4000 as a day laborer in the prior year and she had filed for bankruptcy one month before the burglary. Turner was with Broxton when he purchased a Chevrolet Suburban with $13,500 cash shortly after the burglary. She was aware that he had also purchased a Ford Explorer shortly after the burglary, titled in the name of Brenda Lynch. She claimed to be Brenda Lynch and sought to take possession of the car when Broxton was stopped in a traffic stop unrelated to the burglary. Broxton bought a $3000 engagement ring, though Turner denied ever receiving it. She was found to have ten thousand dollars in cash in a backpack in her bedroom, including one bill marked with a "USPS" stamp.

The explanations offered for the source of this sudden windfall of cash were ludicrous. Turner and Broxton's relatives testified that Broxton was paid some unspecified and unreported sum of cash after working for an unidentified relative in the construction industry in New Jersey. Broxton's mother and sisters testified that other money came as cash gifts from a lavish baby shower in honor of the baby that Turner was bearing to him. Turner was not invited to the shower. Turner's mother and two sisters testified that they each gave him $5000 in cash as a baby gift, though none of them was employed at the time and none could explain where she had obtained such a large amount of cash.

Other undisputed evidence raises the inference that Turner worked with Broxton to conceal the unspent cash from authorities. The morning after the crime, immediately after she had finished her night shift, Turner took Broxton and his uncle Robert on a thirty-six hour road trip to New Jersey. The group remained there only a few hours before returning to Valdosta in time for Turner's next night shift. After it was apparent that she was under suspicion for the crime, she rented a storage shed in Florida using an alias and providing false information. Her recorded telephone conversations with Broxton frequently alluded to the crime and to the fact that she knew where the remaining cash was hidden. On one occasion Broxton instructed his mother to contact Turner to obtain money to purchase a house. On another occasion Broxton instructed Turner to go to a payphone, call "his friends" and tell them to "disappear." Turner's own testimony on the stand was evasive, defensive, often contradictory, and completely lacking in credibility.

The evidence against Turner was so great as to make insignificant any prejudice caused by the inappropriate testimony of Mr. Parrish and Ms. Thorp.  Nothing took place during the trial to draw inordinate attention to the statements.  Defense counsel did not object at the time the statements were admitted.  The objections were raised a day later, outside the presence of the jury.  Counsel for the Government did not discuss the statements in his opening statement or closing argument.  The Court gave a limiting instruction.

In finality the question must be resolved by an application of the reasonable doubt standard.  A reasonable doubt is a real doubt based upon reason and common sense after careful and impartial consideration of all of the evidence in the case.  It is proof of such a convincing character as should be relied upon in the most important of life's affairs. [1]  But reasonable doubt is not fanciful, speculative, conjectural, or capricious, and reasonable doubt does not exclude all possible doubt.

Applying these tests, the Court finds beyond a reasonable doubt that the improper admission of the Bruton-tainted testimony of Robert Parrish and Lekisha Thorp was harmless error, and that the jury would have convicted Turner in the absence of that testimony.  The evidence presented by the Government was credible, essentially uncontradicted, and all pointed only to Turner's guilt.  The evidence offered by Turner and Broxton was just the opposite – incredible and completely at odds with common sense and everyday experience. If the reasonable doubt/harmless error test is to have any practical application, then it must

---

[1] Court's Charge to the Jury, Doc. 77, p. 4.

be assumed that Turner would have been convicted in any event. This is not to say that aberrations do not occur and that some jury at some place on some day might not have convicted Turner without the testimony of Parrish and Thorp. But that is not the test and it is the best judgment of this Court that Turner's conviction was inevitable under this evidence and that the technical violation of the <u>Bruton</u> rule was harmless error. The motion for new trial is denied.

SO ORDERED, this the 27th day of July, 2005.

<u>**s/ Hugh Lawson**</u>
HUGH LAWSON, JUDGE

chw